IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 26-cv-01141-KAS

JUAN MANUEL RAMIREZ DE LA TORRE,

Petitioner,

v.

BRENDA JANNETH LOPEZ HERNANDEZ,

Respondent.

---

**ORDER**

---

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on Petitioner Juan Manuel Ramirez De La Torre's **Verified Complaint and Petition Under the Hague Convention** [#1] (the "Petition"), seeking the immediate return of the minor child A.Y.R.L. to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* The case has been referred to the undersigned for all purposes on consent of the parties. *Signed Consent/Non-Consent Form* [#12]; *Order of Reference* [#14]. The Court has reviewed the briefs, the case file, and the applicable law. For the reasons stated below, the Petition is **GRANTED**.

## I. Background[1]

Petitioner (A.Y.R.L.'s father) and Respondent (A.Y.R.L.'s mother) are citizens of Mexico. Their romantic relationship began in 2015, and they got married in 2021. They

[1] The Court draws these facts from the testimony given at the October 2, 2026 Evidentiary Hearing and the accompanying exhibits admitted into evidence.

lived together in Zacatecas, Mexico, with Respondent's two children from a previous relationship. Petitioner testified that he treated Respondent's children as if they were his own. A.Y.R.L. was born to Petitioner and Respondent in August 2021, and he resided with his mother, father, and two half-siblings in the family home in Zacatecas.

In November 2023, Respondent brought A.Y.R.L. and her two older children across the border into the United States. They have resided in Colorado ever since. The parties offer entirely irreconcilable explanations of how this removal came to pass.

Petitioner testified that Respondent told him she planned to take A.Y.R.L. with her as she accompanied her parents (A.Y.R.L.'s maternal grandparents) and other family members to the United States-Mexico border. *Hr'g Tr.* [#44] at 26:10-27:5. His understanding was that after A.Y.R.L.'s grandparents crossed the border, Respondent would return home to Zacatecas with A.Y.R.L. *Id*. at 27:2-5. He stated that this agreement between them was verbal. *Id*. 27:6-13. He testified that he was shocked to find out on social media that Respondent crossed *into* the United States with A.Y.R.L. *Id*. at 28:24-29:10. Petitioner testified that he contacted Respondent and her family members regularly, and in the beginning, Respondent said she intended to return A.Y.R.L. soon. *Id*. at 29:11-30:3. As time passed, Petitioner began seeking assistance from various Mexican authorities to have A.Y.R.L. returned. *Id*. at 30:4-31:6.

Respondent testified that she wanted to get herself and her children away from Petitioner, and she viewed her parents' journey to the border as her opportunity. *Id*. at 96:15-23. She testified that she made a deal with Petitioner, memorialized by hand-written contract, that she would take A.Y.R.L. to the United States with her family, and in exchange, she would send Petitioner money to help him pay off a debt. *Id*. at 95:2-19,

115:20-116:21. She testified that she lost her copy of this agreement during her journey to the United States, but she accused Petitioner of harboring a copy. *Id*. at 94:18-24, 95:20-96:11, 124:24-125:1. Petitioner adamantly denied that such a contract existed. 145:20-146:2.

Petitioner initiated this action in March 2026. Three months later, while this matter was pending, Respondent initiated divorce and custody proceedings in Zacatecas, Mexico. *See Pet.'s Ex. 21, Notice of Service*. The Mexican judge presiding over those proceedings granted Respondent's *ex parte* request for provisional custody of A.Y.R.L., which remains in effect today pending permanent orders.

## II. Legal Standards

### A. Jurisdiction

The Court has subject matter jurisdiction over this matter. *See* 22 U.S.C. § 9003(a) ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention."); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the . . . treaties of the United States."); *West v. Dobrev*, 735 F.3d 921, 924 (10th Cir. 2013) ("ICARA provides federal district courts with original jurisdiction (concurrently with state courts) over petitions seeking the return of children under the Hague Convention.").

### B. Applicable Law

The purpose of the Hague Convention is to "prevent parents from abducting their children in order to avoid unfavorable custody decisions in the children's country of habitual residence." *Centeno Aguirre v. Hernandez*, 757 F. Supp. 3d 1211, 1217 (D. Colo. 2024). In other words, it "attempts to prevent an international version of forum shopping,

wherein a parent dissatisfied with current custodial arrangements flees with the child to another country to re-litigate the merits of custody and to obtain a more favorable custody order." *Navani v. Shahani*, 496 F.3d 1121, 1128 (10th Cir. 2007). Thus, the Hague Convention "creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody." *Id.* at 1124. As relevant here, the United States and Mexico are both signatories to the Hague Convention. HAGUE CONF. ON PRIVATE INT'L L., *Status Table 28: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction*, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Nov. 2, 2026).

In adjudicating Hague Convention cases, the Court is not authorized to address the merits of the underlying custody dispute. *See* 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). Put differently, "**the question of which parent would be a better custodian for the child is not before this Court.**" *Gil-Leyva v. Leslie*, No. 17-cv-01406-KLM, 2018 WL 10322064, at *2 (D. Colo. Apr. 17, 2018) (emphasis added), *aff'd*, 780 F. App'x 580 (10th Cir. 2019). Instead, the Court's inquiry is limited to whether the respondent's removal or retention of the child was "wrongful" pursuant to the Hague Convention and ICARA.

A petitioner seeking the return of a child bears the "initial burden of establishing by a preponderance of the evidence that [r]espondent wrongfully" took the child. *West*, 735 F.3d at 929. "This initial prima facie case consists of three elements: (1) the child[]

habitually resided in a signatory state at the time they were wrongfully removed or retained; (2) such removal or retention breached the petitioner's custody rights under the law of that state; and (3) the petitioner was exercising those rights at the time of the wrongful removal or retention." *Johnson v. Johnson*, 669 F. Supp. 3d 1089, 1100 (D. Colo. 2023) (citing *West*, 735 F.3d at 929).

Even if a removal is deemed wrongful, "children are not required to return to the country of habitual residence if 'one of the affirmative defenses or narrow exceptions set forth in the Convention' applies." *Livingstone v. Livingstone*, No. 22-1308, 2023 WL 8524922, at *2 (10th Cir. Dec. 8, 2023) (quoting *West*, 735 F.3d at 931). These defenses include:

1. The proceeding was commenced more than one year after the child's retention and the child has become settled in his or her new environment;
2. The parent seeking the return of the child either consented to or subsequently acquiesced in the retention;
3. There is a grave risk that the return of the child would expose the child to physical or psychological harm; and
4. The child's return would run afoul of the requested State's fundamental freedoms or principles concerning protection of human rights.

*See Centeno Aguirre*, 757 F. Supp. 3d at 1218. The first two exceptions must be established by a preponderance of the evidence, and the second two exceptions require proof by clear and convincing evidence. *Id.* at 1230. These exceptions are to be "narrowly construed." *Johnson*, 669 F.Supp.3d at 1100 (quoting 22 U.S.C. § 9001(a)(4)). And because "[c]ourts in signatory nations take violations of the Convention very seriously,"

even if an exception to a wrongful removal claim is established, the Court retains "discretion to order the return of the child if it would further the aim of the Convention, which is to provide for the return of a wrongfully removed child." *Id.* at 1101 (quoting *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007)); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 19-24 (2014) (J. Alito, concurring) (discussing a court's discretion to order return where the circumstances so warrant, even where a defense has been proven).

## III. Analysis

### A. Prima Facie Case of Wrongful Removal

The parties do not dispute that Petitioner has established, by a preponderance of the evidence, a prima facie case of wrongful removal. *Response* [#42] at 5. The Court agrees. Petitioner testified that A.Y.R.L. lived in Zacatecas, Mexico, from the date of his birth until the date of his removal to the United States. Petitioner provided translated copies of the Zacatecas Family Code, which conclusively establish that Petitioner has rights of custody to A.Y.R.L. within the meaning of the Hague Convention. *See Pet.'s Ex. 5, Translated Family Code of the State of Zacatecas*, at Arts. 371, 372, 375, 379. Finally, Petitioner testified that he was exercising his custodial rights to A.Y.R.L.—in other words, he had not abandoned A.Y.R.L.—at the time of his removal.

### B. Defenses

Respondent invokes the first three defenses established by the Hague Convention. *Response* [#42] at 5. The Court addresses and rejects each defense in turn.

#### 1. Well Settled

The "well-settled" defense provides that where a petitioner invokes Hague Convention proceedings over a year after the removal, the court shall order the return of

the child "unless it is demonstrated that the child is now settled in its new environment." *Centeno Aguirre*, 757 F. Supp. 3d at 1230 (quoting Hague Convention, art. 12). The Court considers two factors: (1) the passage of time, and (2) the age of the child as an indicator of his ability to develop "meaningful connections to the new environment." *See id.* at 1231. On the second point, proving this defense requires evidence of "significant connections to the new country." *Id.* at 1230 (quoting *In re Robinson*, 983 F. Supp. 1339, 1344-45 (D. Colo. 1997)). "[C]ourts have held that this defense is intended to pertain to a situation in which a child is abducted in infancy, and an application is filed after so long that it becomes impossible to deny the child's acclimation." *Dumitrascu v. Dumitrascu*, No. 21-cv-01813-PAB, 2021 WL 4197378, at *11 (D. Colo. Sept. 15, 2021) (quoting *Filho v. de Albuquerque*, No. 20-cv-01421-RBJ, 2020 WL 9455201, at *8 (D. Colo. Aug. 21, 2020)), *aff'd*, No. 21-1341, 2022 WL 1529624 (10th Cir. May 16, 2022).

***Passage of Time.*** Respondent removed A.Y.R.L. from Zacatecas in November 2023. Petitioner initiated this action in March 2026. Thus, approximately two years and four months passed from removal to filing. Petitioner does not dispute this, instead explaining that there was uncertainty in the beginning insofar as Respondent said she planned to return A.Y.R.L. soon. Further, once it became clear that she would not return, Petitioner spent significant time seeking help from Mexican agencies that were unable to help him before identifying the proper channels for his complaint. *Opening Br.* [#39] at 14; *see also Pet.'s Ex. 2, Explanation for the delay*. Respondent has met her burden on this factor.

***Age.*** A.Y.R.L. was just over two years old when he was removed from Zacatecas. When Petitioner initiated this action, A.Y.R.L. was approximately four and a half years old. He is now five.

To be sure, Respondent provided significant evidence of A.Y.R.L.'s support system in Colorado. A.Y.R.L. lives with his mother and older siblings; he has remained in the same stable housing since relocating to Colorado; he lives in the same apartment complex as his grandparents, maternal aunt, and cousins, whom he sees often; he receives regular healthcare from a pediatrician; he began kindergarten this past August, and attends the same school as his older brother; the family regularly attends church; Respondent has a stable job; and A.Y.R.L.'s older sister cares for him while Respondent is at work—all the makings of a happy and healthy childhood. *Hr'g Tr.* [#44] at 83:1-85:3, 85:16-92:8. Indeed, if the question was whether A.Y.R.L. is doing well here, this would be a much easier case to decide. "The Court must be careful, however, not to engage in a best interests of the child inquiry," or try to determine where A.Y.R.L. would be "better off"—an inquiry that should generally be reserved for courts in the child's habitual residence. *Dumitrascu*, 2021 WL 4197378, at *12. "'[W]ell-settled' means more than having a comfortable material existence." *Id.* (quoting *Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998)). The question is whether A.Y.R.L. has become *so* integrated into his new community that the Court must decline to rectify the wrongful removal.

A.Y.R.L.'s age significantly undermines his ability to form the type of connection to the removal country that this defense was designed to protect. Courts regularly hold that children A.Y.R.L.'s age are not old enough to become well-settled in their new environment. *See id.* (collecting cases); *Guevara v. Castro*, 155 F.4th 353, 364 (5th Cir.

2025) ("At age seven, A.F. is not yet capable of forming the kind of enduring attachments that the Convention deems sufficient to override its default return remedy."); *Guevara v. Soto*, 180 F. Supp. 3d 517, 531 (E.D. Tenn. 2016) (holding that a five year old child who spent half of his life in Mexico and half of his life in the United States was not "at such an age where moving him back to Mexico would disrupt his development or maturation"); *Habrzyk v. Habrzyk*, 775 F. Supp. 2d 1054, 1066-68 (N.D. Ill. 2011) (rejecting well-settled defense for four-year-old child); *In re Hague Child Abduction Application*, No. 08-2030-CM, 2008 WL 913325, at *11 (D. Kan. Mar. 17, 2008) (rejecting well-settled defense for six-year-old child); *cf. Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (adopting well-settled defense for nine-year-old child).

Therefore, regardless of Respondent's compelling evidence as to the remaining considerations, A.Y.R.L.'s young age prohibits the Court from finding that this defense has been established by a preponderance of the evidence.

**2. Consent**

"Article 13(a) of the Convention provides that the Court is not bound to order the return of the child if [Petitioner] 'consented to or subsequently acquiesced in the removal or retention.'" *Centeno Aguirre*, 757 F. Supp. 3d at 1231 (quoting Hague Convention, art. 13). Consenting to a child's temporary travel is insufficient to show that a parent consented to the child's permanent removal. *Id.*

Respondent testified that Petitioner gave her a signed document authorizing her to take A.Y.R.L. to the United States as long as she would help him pay off a debt. She testified that she stored the agreement in one of her bags during her travels, but she accidentally left the bag behind on a bus. *Hr'g Tr.* [#44] at 95:11-96:7. Respondent's

mother testified, somewhat vaguely, that she had seen the document and could confirm that it was lost in transit. *Id*. at 140:24-141:7, 142:23-143:13. However, she could not speak to the document's contents. *Id*. at 143:11-13. The Court does not find this testimony credible for the following reasons.

*First*, on cross examination, Respondent admitted that Petitioner asked her and her family members multiple times for A.Y.R.L. to be returned to Mexico. Thus, his subsequent conduct was inconsistent with the knowledge and consent that Respondent testified to, and she did not attempt to explain or reconcile this tension in her story. The Court has reviewed pages and pages of messages sent between Petitioner and Respondent, and between Petitioner and various of Respondent's close relatives. *See generally Pet.'s Ex. 9, Screenshots of Messages; Pet.'s Ex. 18, WhatsApp Messages*. In these messages, Petitioner frequently inquired about his son's return and lamented the pain he was experiencing being separated from him. If Respondent's story was true, the Court would have expected to see at least some responsive messages pointing to the fact that he agreed to this. The Court was unable to locate any such message. Instead, the various responses from Respondent and her relatives to Petitioner's pleas generally struck a sincerely apologetic and regretful tone for the situation he was in, which is inconsistent with Respondent's theory that Petitioner knew and agreed to this arrangement from the outset.

*Second*, Respondent's testimony concerning the hand-written contract was quite nebulous. She did not provide any details about the time, place, and manner of the conversations surrounding this agreement. *Hr'g Tr.* [#44] at 94:7-95:19. She did not indicate who drafted the agreement, who presented it to whom, or whether either party

negotiated or offered counterproposals. *Id*. She did not expound on the subject debt that Petitioner owed. *Id*. at 94:18-24. Indeed, her testimony about this agreement was offered in the vaguest of terms. Absent a copy of the agreement or more concrete testimony offering indicia of reliability, the Court is not inclined to accept Respondent's story at face value. *See Garcia v. Varona*, 806 F. Supp. 2d 1299, 1318 (N.D. Ga. 2011) ("Respondent, however, has not offered any factual basis for her claim that Petitioner consented or acquiesced to her removal of the Children to the United States beyond her self-serving testimony that Petitioner said she could take the Children anywhere.").

*Third*, if Petitioner really knew and consented to A.Y.R.L.'s removal to the United States, then some of Respondent's written discovery responses are puzzling. Take, for example, Respondent's answer to Petitioner's Interrogatory No. 1:

> Interrogatory No. 1: Describe in detail the circumstances surrounding Your departure from Zacatecas, Mexico on or about November 15, 2023, including a description of who traveled with You, the planned destination, the means of travel, **and every Communication You had with Petitioner about the trip before, during, and after departure**.
>
> Answer: I left Fresnillo, Zacatecas on November 15, 2023 and traveled to Colorado with my three children (including our son) and my parents. My husband and I had already been separated for about six months by that point, and **he knew I was planning to travel with our son *toward* the border together with my family. I did not hide this from him**.

*See Pet.'s Impeachment Ex. 1, Pet.'s First Set of Written Discovery Requests to Responses* (emphases added). Notably, if Respondent had taken A.Y.R.L. to the United States pursuant to a written agreement with Petitioner, that fact would have been front and center in this response. Instead, she merely stated that Petitioner *knew* she was taking A.Y.R.L. *toward* the border, which is much more consistent with his version of events than her subsequent testimony.

To bolster her testimony concerning Petitioner's consent, Respondent presented a screenshot of a message that Petitioner sent on Facebook messenger. Referring to the fact that Respondent had a new romantic partner, Petitioner said:

> I don't know who he/she is . . . and I don't want to know. I just wish you could see how much this hurts me.
>
> For God's sake, we have a child together. I have supported him in everything. I paid for school, he is studying; I gave them everything. I even gave them money for him to go to the U.S., and you didn't know about it.

*See Resp.'s Ex. G, Facebook Messenger Admission*.[2] Respondent characterizes this message as an admission that Petitioner knowingly and intentionally sent Respondent and A.Y.R.L. to the United States with his financial support. Petitioner testified that his message shouldn't be read that way, and that he meant something different: he was simply conveying that he gave Respondent money for all sorts of things related to A.Y.R.L.'s care, and that (unbeknownst to him at the time) she even used the money to take A.Y.R.L. to the United States. *Hr'g Tr.* [#44] at 44:7-45:8, 50:10-15, 50:25-51:3. In other words, it would be more accurate to read his message as follows: "I even gave them money, all for her to go to the United States, and you didn't know about it."

Frankly, the Court cannot discern what is being said here. The Court presumes that some linguistic nuances baked into the original message have been lost in translation. In any event, the message does not move the needle in Respondent's favor. First, Respondent did not provide the messages before and after this supposed admission so that the Court could attempt to draw meaning from the surrounding context. Second,

[2] For clarify of the record, the Court includes the original, untranslated Spanish text here: "Yo no sé quien es….. Ni quiero saber. Solo que vieras como me duele. Por dios, temenos un hijo, le he apoyado en todo. Le saqué la escuela. Esta estudiando, les di todo. Hasta para irse a EUA les di dinero y tu no lo supiste." *See Resp.'s Ex. G, Facebook Messenger Admission*.

the phrase "to the U.S." is ambiguous here because the parties agreed that Respondent would take A.Y.R.L. *to* the United States-Mexico border from their home in Zacatecas. Thus, Petitioner could have given her money to take A.Y.R.L. *to* the United States without in any way undermining his theory of the case. Of course, if he had said he gave her money for A.Y.R.L. *to live* in the United States, that would be a different story. But without more, the Court does not believe this message establishes proof of consent by a preponderance of the evidence.

Finally, to the extent that Respondent asserts that Petitioner's conduct demonstrates acquiescence over a period of time, the Court is unpersuaded. To establish acquiescence, the Respondent must show "a consistent attitude of acquiescence over a significant period of time." *Centeno Aguirre*, 757 F. Supp. 3d at 1231. Here, Petitioner's frequent messages asking for A.Y.R.L.'s return and his documented efforts to seek help from authorities convincingly undermine any claim of a "consistent" attitude over a "long period." *See id.*

**3. Grave Risk of Harm**

"The grave risk defense provides that a child wrongfully removed from his habitual residence or retained should not be returned where there is a grave risk that the return would expose the child to physical or psychological harm or 'otherwise place the child in an intolerable situation.'" *Id.* (quoting *Gil-Leyva*, 2018 WL 10322064, at *5). Courts in this Circuit have recognized the applicability of the grave risk exception where (1) the child would be returned to "a zone of war, famine, or disease"; or (2) the child would face "serious abuse or neglect, or extraordinary emotional dependence" that the country of habitual residence is "incapable or unwilling" to ameliorate. *West*, 735 F.3d at 931 n.8.

"Grave risk" means that the "potential harm to the child must be severe, and the level of risk and danger . . . very high." *Gil-Leyva*, 2018 WL 10322064, at *5 (quoting *West*, 735 F.3d at 931).

The first type of grave risk is not at issue here. As to the second, Respondent testified that, from the beginning of her relationship with Petitioner, he was "verbally and physically abusive." *Hr'g Tr.* [#44] at 96:15-23. She stated that he physically abused her on approximately six occasions. *Id*. at 107:10-17. Although he never abused the children, some of the incidents happened in front of the older children. *Id*. at 107:24-108:6. A.Y.R.L. was either not present during these incidents or was too young to understand what was happening. *Id*.

Respondent described in detail the worst instance of physical violence on May 14, 2023—approximately six months before she left Zacatecas. *Id*. at 97:24-102:6, 104:19-105:14. A.Y.R.L. would have been approximately 20 months old at the time. Respondent testified that she and Petitioner were having marital issues due to infidelity, and that Petitioner was staying somewhere else at the time. *Id*. They worked out an informal arrangement to split A.Y.R.L.'s time between them. *Id*. On the evening in question, A.Y.R.L. was with Petitioner, and Respondent received a call from someone in the neighborhood stating that Petitioner had another woman in the home during his parenting time with A.Y.R.L. *Id*. Respondent went to the place where Petitioner was staying to confront him. *Id*. She knocked on the front door, and an altercation ensued. *Id*. She testified that Petitioner hit her in the face, strangled her, put her into a truck, and drove her home while A.Y.R.L. was left in the care of the other woman. *Id*. Respondent testified

that, from where she was standing in the front entryway, she "couldn't see" A.Y.R.L. at all. *Id*. at 100:7.

"Though . . . testimony [of spousal abuse] is deeply concerning, and undeniably will figure in [the underlying] custody proceedings, spousal abuse is relevant for Article 13(b) purposes only if it 'seriously endangers' the child." *Gil-Leyva*, 780 F. App'x at 590 (quoting *Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012)). "[I]solated incidents of abuse generally demonstrate a risk of harm only to the spouse." *Id.* "At a minimum, the spouse must 'draw a connection' showing that the risk such abuse poses to her 'constitute[s] a grave risk to the children.'" *Id.* (quoting *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010)).

Here, Respondent failed to draw any connection between the isolated incidents of domestic violence and a grave risk of harm to A.Y.R.L. Indeed, the undisputed testimony established that A.Y.R.L. had never once been abused by his father, and that he never consciously witnessed any domestic violence incidents between his parents. Courts have found more dire circumstances insufficient to establish a grave danger to the child. *See Gil-Leyva*, 2018 WL 10322064, at *6-7 (the petitioner would throw items when angry, but never hit the children with those items; spanked the children, leaving marks; left non-child resistant bottles of prescription medication within children's reach; left diapers unchanged; failed to use a proper child seat in his car; left power tools within children's reach; and physically abused the respondent); *Centeno Aguirre*, 757 F. Supp. 3d at 1232 (children were underweight and had tooth decay); *Warren v. Ryan*, No. 15-cv-00667-MSK-MJW, 2015 WL 3542681, at *4 (D. Colo. June 5, 2015) (uncorroborated allegations of physical harm to children and the petitioner's tendency to leave the children

unattended); *see also Gil-Leyva*, 780 F. App'x at 592-93 ("We sympathize that the circumstances in which Mr. Gil-Leyva lives are not ideal for children, but the grave-risk defense 'may not be used as a vehicle to litigate (or relitigate) the child's best interests.'" (quoting *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002))).

Finally, Respondent offered *no* evidence that Mexico's family court system is unable or unwilling to provide ameliorative measures that would mitigate risks to A.Y.R.L. For these reasons, the Court concludes that the defense has not been established.

**4. Other Discretionary Consideration**

Courts in this Circuit have recognized a court's discretion to consider all relevant circumstances in Hague Convention cases, including ordering the return of a child when the circumstances so warrant, even where a defense has been established. *See Johnson*, 669 F.Supp.3d at 1100-01; *de Silva*, 481 F.3d at 1285.

Thus, the Court exercises its discretion to address two final considerations. First, the Court recognizes that Respondent initiated divorce and custody proceedings in Mexico, securing an *ex parte* order for temporary custody of A.Y.R.L. pending final orders. Respondent asks the Court to view this temporary custody award as a factor that should weigh in her favor. However, Respondent inexplicably takes the position that she has no intent to see the Mexican proceedings through, instead representing that she wants to initiate proceedings here in the United States. The Court will not go so far as to accuse Respondent of acting in bad faith, but she certainly does not get to have it both ways. To obtain an *ex parte* temporary custody order and run away with it, without submitting to the court's jurisdiction to enter permanent orders, would create a grave risk of unfairness to

Petitioner, who is entitled to participate in the proceedings that will ultimately determine A.Y.R.L.'s best interests.

Second, although the Court is ordering the forthwith return of A.Y.R.L. to Mexico, the return is to a *place*, not a *person*. See *Gil-Leyva*, 2018 WL 10322064, at *7. It is the job of the Mexican courts to determine the permanent custody rights of the parents, and this Order should be understood to defer to the rights of the Mexican family courts. Therefore, as the temporary custodian of A.Y.R.L., Respondent may, consistent with this Order, accompany him to Mexico and take up residence with him there while defending her interests in the ongoing divorce and custody proceedings. *See id.* (citing *Warren*, 2015 WL 3542681, at *7).

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Petition [#1] is **GRANTED**.

IT IS FURTHER **ORDERED** that Respondent shall make travel arrangements to ensure that A.Y.R.L. is returned to Mexico **within 28 days** of entry of this Order.

IT IS FURTHER **ORDERED** that Respondent shall file a Notice of Compliance with this Order **no later than 7 days** of A.Y.R.L.'s return to Mexico.

IT IS FURTHER **ORDERED** that each party shall bear his or her own costs in this matter.

IT IS FURTHER **ORDERED** that the Clerk of Court shall terminate this case.

Dated: November 25, 2026

BY THE COURT:



Kathryn A. Starnella
United States Magistrate Judge